Please call the next case. Our next case is 5-14-02-84-WC. Stephen L. Foster with the Workers' Compensation Comm'n. May it please the court. Good afternoon, gentlemen. I'm so happy to be close to you because I know from this distance, you will all be able to hear my tie. The choice of... Yes, sir. Well, I presume you can. Let me know if you can. This choice was inspired by the red buds in bloom down in southern Illinois right now. But I don't know why they call them red buds, because they're not red, they're pink. And, you know, they're this color. Anyway. And that provided the enthusiasm for your argument here today, right? You know, whatever it takes. Right now, red buds are getting me out of bed. They're beautiful. They're beautiful down there. I represent the petitioner in this cause, Mr. Foster. And we are here asking you to reverse the commission, because humbly, common sense requires it. Illinois law compels it. And justice demands it. You know, when I was in front of the arbitrator, my job, my burden was to show that I was more likely right than wrong. That's all. And now today, I'm supposed to pound my fist up here and use this phrase, manifest weight. Yeah, your burden just got higher. Oh, that's bad news. Well, it is, right? I mean... I don't know what that phrase means. I know this. I know, or I am persuaded, that I can show you that it was clearly apparent on that day that I should have won. The judge reached the opposite conclusion, of course. By judge, I mean arbitrator. Now, this is a causation case, and there's only a small challenge in arguing before you today. And that challenge comes from the fact that the arbitrator's decision contains no analysis. There are just three conclusions set forth, in addition to pages and pages of facts, only some of which are were fairly inaccurately put in front of you. But the three conclusions are, number one, that we failed to prove the SI joint disorder was causally related to the accidents, the two of them. And number two, two and three bleed together. But two is that Mr. Foster, the petitioner, was suffering And number three, again, quite related to two, that it reads that even under liberal aggravation standards, and I add parenthetically and rhetorically, what does that have to do with anything? That it was hard to find the petitioner's condition was related when he was suffering identical symptoms one month before the injury. So, beginning with failed to prove SI joint dysfunction causally connected. That is not what we were trying to prove. And boy, when you read that the arbitrator concluded that, when we weren't trying to prove that, I guess you know you're in trouble. I wasn't subtle. The petitioner testified he was there asking the arbitrator to authorize, to compel, surgery by Dr. Gornett, who intended to install an artificial disc at L5-S1. We were not there about SI joint dysfunction. I don't know how you listen to my case and you conclude otherwise. We submitted two depositions of experts, Valarich and Gornett. They said that was the problem and they said that was the treatment he needed. L5-S1, not SI joint. Who's Dr. Lange? Dr. Lange is a long-time surgeon in the metro area, the St. Louis metropolitan area. He is, to my lights, a far better IME than Dr. Merkin. I think he's a straight shooter and I think he's sometimes wrong. And I think he's wrong in this case. I was going to say, we appreciate your candor because Dr. Lange felt the petitioner's condition was not caused or aggravated by the alleged workplace accident, correct? Oh yeah, that's what he said. And obviously the arbitrator, and ultimately the commission, believed him. I have no idea what the arbitrator really believed, but I'm well aware that a young judge, M.G., concluded that probably the commission and the arbitrator leaned heavily on Lange's opinion. And what's wrong with that? Well, a lot. In a word? A lot? In a word, a lot. Let me go ahead. There's two words that way. Where to begin? All right. If you lay this on a pre-existing SI joint dysfunction problem, then you have to explain, and he did not, why this patient has 99% occlusion, that's the claudication problem, in his leg that gets fixed and it is followed by 26 months of no symptoms. How do you explain that, Dr. Lange? He couldn't. Okay? 26 months. Nothing. Until, until he floats into this nurse's station, or whatever she is at the plant, and on three occasions gets seen about three and a half weeks before these two accidents that happen in short succession. So this chronic SI joint dysfunction problem can be boiled down to, or distilled to, yeah, lots of treatment misdiagnosed as an SI joint dysfunction until somebody, Dr. Jones, says, scratches his chin and says, I wonder if your artery is clogged up. Test. Result? 99% clogged up. Surgery. Resolution of symptoms. No treatment. So that's the first problem. You've got to explain this to me, and he did not. And he doesn't explain it to you either. Dr. Lange, secondly, committed a sin. And that is, he took this gentleman's very minor, very mild, psychological history of anxiety, and he held it against him. You will recall that Dr. Lange's other basis for his opinion of no causation is that this discogram done by Gornett, which is Gornett's way of showing, boom, yeah, it really is L5-S1. As some people early on had suspected, but that was ignored because everybody latched onto the SI joint dysfunction diagnosis. Gornett does a test. He injects the disc with a certain pressure. This is called a discogram. And he sees if that causes, precipitates pain in the back. It's a blind test for the patient. And if all of this sounds vaguely familiar, it's because I complain bitterly about evidentiary rulings, which I know are probably not outcome determinative. But for the love of God, when you are at an arbitration and you ask your client how many times you get sticked with a needle in your back, and he isn't allowed to answer, I mean, come on. But anyway. Who's Dr. Mishkin? Marvin Mishkin is the other IME by the respondent in this case. Who also said that the petition's condition was in no way associated or caused by the events of May 2008, correct? Yes, he did. Obviously, we're asking this because you, as an experienced attorney, know what the test and the standard of review is. He's going to point, I suspect, and I'm not claiming to be psychic, that there was evidence in the record to support the arbitrator and ultimately the commissioner's decision, right? We can assume that, I think, very safely. So tell us why we can't rely on those two doctors. Because then as now, it's clearly apparent I am more likely to have been right on that day. Mishkin couldn't answer the same question I asked of this panel rhetorically and of Lange. You know, you can't just throw, look, Mishkin was, when I started practicing law 21 years ago, Mishkin was giving these decisions. He didn't even engage in the fight, okay? He was, he had been around forever 21 years ago. So do we take judicial notice of that? I'd love you to. Man, there's nothing I would be more happy than you taking judicial notice of the first half, what I just said, and the second half that's in my head and I'm formulating. But let me take the question more seriously, because he is not a straight shooter, okay? That's why. He's not a straight shooter. Lange's a straight shooter. Lange couldn't answer my question. Mishkin couldn't answer my question, but I don't care. I don't care. I'm not going to dignify his work with a comment. They cannot answer the tough question, what about the 26 months? And then they have, I mean, look, they lay it on the preexisting SI joint dysfunction, okay? And they say the evidence of that is all the stuff he had before the claudication surgery and those three little visits. Well, those three little visits of PT, again, approximately three and a half weeks before the incidents, this young assistant physical therapist, she even does a Patrick's test. That would be the test to find out if you have SI joint dysfunction. It's negative. She also did an SLR, straight leg raise test. It was negative. He had a pulled muscle in his back. He gets the tiniest bit of electrical stim. He stretches at home, and then three days before these accidents happen, he's with his family doctor. He doesn't mention a thing. He didn't even remember a trial, okay? It is a non-issue. Please, but look, don't throw me into that prior patch. Maybe, I mean, I can argue what I don't believe. I don't believe I proved up an SI joint dysfunction aggravation, but you might, and why might you? I mean, I don't because I know he went ahead and had the artificial disc surgery, but there's no vehicle for me to put that in front of you, as you know. But look, in the 45 days after this gentleman had these two injuries at work, and there were accidents because, remember, they found that he had the shoulder accidents those days, just not the important accidents, accidental injuries. In the 45 days that follow, he has, count them, I listed them, 24 medical interventions. He's on Percocet, and then he gets raised. He has two sets of epidural steroid injections. He has nerve blocks. They planned for him to have that nerve-burning surgery called a nerectomy. I mean, this is heavy-duty stuff. They take him off of work, and wait a minute, and that's not an aggravation? That means there was no aggravation that day? That just, which, this is all further to answering your question about Old Martin, Michigan. I appreciate that background. No aggravation? That is the most intense, I mean, if I can't make an aggravation case on that, what do I do? And note the double standard, which goes like this. You know, this three visits down the hall at the nurse's station with the assistant physical therapist, if I try to make that into a back case, if I file that as a claim, and somebody points out to me, no permanency, no treatment, no time off work, no referral to anybody, three weeks later he's in front of his family doctor, makes no mention of it, do I get any money on that case? No! But they are using it to block an aggravation case, which is followed by 24 medical interventions in the following 45 days? That is a double standard. And the law disfavors double standards. I am at the end of my time, but I will stop yelling and answer questions if there are any. Well, actually, we do have until the light turns red. Thank you. All right. I'm a rookie. I'll sit down and wait for my... You have time on reply. Thank you. You may respond. Good afternoon. May it please the court, counsel. As has already been pointed out, there's only one issue before us right now, was the decision against the manifest weight of the evidence. And as is abundantly clear in counsel's argument, the only thing being argued here are the facts. Those have already been decided by the commission. I think that counsel's bothered by the fact that they found, I guess, and Dr. Lange found that the petitioner had an SI joint disorder. You can call it whatever you want, but obviously the petitioner had it one month before his claim to work accidents. And the commission used that evidence and the evidence of Dr. Lange to make their findings. And there's nothing in the record to support anything else as against the manifest weight of the evidence. I think the central question is whether or not there's any evidence to support the decision of the commission. There is ample evidence to support the decision of the commission. Let me just interject this because we frequently get this, and I feel compelled to point this out. And this is thrown around by a lot of lawyers and some judges, but the test isn't whether there is any evidence. The test is whether there's sufficient evidence. It's subtle, but you can appreciate the difference. And there is sufficient evidence, obviously, in the fact that the petitioner saw two spinal surgeons who both said the same thing. And those names I don't even think were mentioned by counsel. Dr. Ukulis and Dr. Kowalski both said the petitioner had an SI joint disorder, had no need for surgery or any treatment to the low back, had an SI joint disorder, was confirmed by injection in the SI joint. Did they opine a lack of causal connection? I'm sorry? Did those two doctors you just alluded to, did they also opine a lack of causal connection? I think they know the history, but obviously who knows what it's based upon because we're looking at medical records in a vacuum. We didn't take their depositions. They didn't, to my knowledge, have any evidence to read all the preexisting medical records that somebody like Dr. Lange had. All right, so you've got Michigan and you've got Lange. These two doctors didn't help his side either, you're saying? Not in terms of diagnosis that he keeps on complaining about in terms of SI joint disorder. I think the point being that he keeps on saying the commission focused on SI joint disorder. The commission pointed out the SI joint disorder because all of the doctors except for Dr. Lange or Dr. Gornet diagnosed the petitioner with SI joint disorder. Thereafter the question becomes, was the SI joint disorder aggravated by the two work accidents that he claimed? The commission said no based upon Dr. Lange, Dr. Michigan, and the preexisting records, and therefore there is sufficient evidence in the record to support the commission's decision. The petitioner in this case is spending the arguments trying to re-argue the facts and the inferences that can be drawn and the conclusions that can be drawn from those facts. Obviously I think that's proper for the commission, not at this level. And I think counsel even acknowledged this in his argument that there's no argument that the commission misstated the facts in the opinion, that facts are all accurately stated. I don't believe that he likes their interpretation of the facts. And again, that falls within the province of the commission to do so. And like I said, I think the argument is just because Dr. Gornet wants to do a disc replacement surgery, therefore since he says that it's so, this petitioner has to suffer from a spinal condition. And that's what I was pointing out before. There's a huge amount of medical records in this case that support the opposite conclusion, that no surgery was necessary, that the petitioner suffered a long-standing chronic SI joint disorder. Even Dr. Kowalski found no real spinal pathology on the lumbar MRI. He found the SI joint disorder as a diagnosis based upon a confirmatory injection. The facts in the records all support the findings. The petitioner's attorney, obviously, counsel keeps on pointing out what he says is a 26-month gap where the petitioner was apparently cured of anything, but then he cannot explain how his client had symptoms one month before the claimed accidents. That was never explained. Because of that, I think it's fairly clear that there was sufficient evidence in the record for the commission to base this decision upon. Thank you. Do you have any questions? No. Thank you, counsel. Counsel, you may reply. Thank you very much. Look, I get the cognitive dissonance. It is hard to understand that a bunch of doctors, not just one, might get the diagnosis wrong. But you know what? You need look no farther than this gentleman's own medical history for the same thing. You know all this vague pool that we give a cat pool of treatment and symptoms that we give a label to called long-standing SI joint dysfunction, that was a whole mess of treatment in the record and discussed ad nauseum in the record that all discussed low back and SI joint problems and probably, maybe, sort of some objective testing to prove it. And you know, it all went away when that artery was cleared up. Huh. They all got it wrong. All those doctors got it wrong before. 99% occluded. That is not much left, okay? It fixed the problem. Then you go the 26 months. And then he goes in, again, to the young assistant physical therapist who is at the nurse's station down the hall. And he visits her three times. And she does this test called PATRIX for the specific condition we've all been chatting about, SI joint dysfunction, and it's negative. He does have tight hamstrings, though. Sure enough, which, by the way, can kind of cause your back pain. He does his stretching at home. It goes away. He sees his doctor a few days before these incidents. Nothing. Nothing in the record of that visit. And then he has these two incidents, and all hell breaks loose. And there is all of this treatment. And again, you know, it's not like the low back wasn't ever tossed around. The early MRI, the early CT, both showed L5-S1 pathology. Dr. Feather wanted to pursue it. And in this long, you know, rollout of treatment for an SI joint dysfunction, and the Kowalski gets underway, the man had never seen him, he could find, he could look at an insect with an exoskeleton and find an SI joint dysfunction problem. Trust me. Okay? He gets it going. All this treatment, it doesn't do any good. It doesn't do any good for his problem. He is seeing a therapist by the name of Mulvaney, and Mulvaney is looking at him, and he's watching him. He's visiting with him two or three times a week. Mulvaney is like, you know what? I don't think you have an SI joint dysfunction. That's what we've been doing, and you've had all this treatment. I don't know. You know, why don't you go over to Gornet and check out the L5-S1? Oh, okay. He goes. They do another MRI. Positive. They do the discogram. Positive. You know, that's the obvious conclusion here. I know everybody's got to get over this problem of several doctors who are treating an SI joint dysfunction just like they were before, before the claudication surgery by the vascular surgeon Jones, when they got it wrong also. So there comes Gornet, and he says the obvious. Yeah, you know, none of this treatment's worked. You've got pathology at that disc. You need a disc replacement. That was clearly apparent then. It's clearly apparent now. And I thank you for your time. Thank you, counsel. Both of your arguments in this matter were taken under advisement and a written disposition shall issue.